STATE

v.

**Gerald S. MASTRACCHIO.**

No. 87–328–C.A.

Supreme Court of Rhode Island.

July 28, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Annie Goldberg, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine A. Gibran, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

FAY, Chief Justice.

On December 4, 1985, a grand jury composed of twenty people returned indictment No. Pl/85–3173 against the defendant, Gerald S. Mastracchio, charging him with the 1979 murder of Richard Valente (Ricky). A Superior Court jury found the defendant guilty of the murder in violation of G.L. 1956 (1981 Reenactment) § 11–23–1. Having denied the defendant's motion for a new trial, the trial justice committed the defendant to the Adult Correctional Institutions for a mandatory life sentence. Section 11–23–2. The defendant, who was seventeen years old at the time of the murder, appeals to this court, contesting the Superior Court's jurisdiction. He also assigns as error certain evidentiary rulings.

Meredith Valente, mother of the deceased, reported to the West Warwick police on December 13, 1979, that her thirteen-year-old son had been missing for two days from their home in the Elms Apartment Complex at 55 Cowesett Avenue. The report also indicated that he had run away on a previous occasion. Valente's parents testified at Mastracchio's bail hearing and trial that after the first run-away incident, Ricky was treated by a psychologist and that Mrs. Valente waited to notify the police because she was hoping that her son would return.

Mrs. Valente last saw her son on December 11, 1979. Ricky arrived at her place of employment for a ride home, as he did every afternoon after school. Having a Christmas party to attend, Mrs. Valente drove her son part-way home and let a coworker complete the trip. She testified that when she returned home at 9:30 p.m., Ricky was not there. Among other efforts she made to locate Ricky, the following evening she went to the Mastracchio apartment to ask defendant if he had seen Ricky. Although defendant stated that he had been home all night, and his mother supported that statement, defendant's sister claimed that Gerald had gone out.

Two days after Mrs. Valente reported Ricky missing, a total of four days after his disappearance, the Jamestown police responded to a report of a body lying face down on the west shore of Jamestown Bay, just north of the bridge. Rhode Island's Chief Medical Examiner, Dr. William Q. Sturner, performed an autopsy the following day, December 16, 1979.[1] Doctor Sturner testified at trial that the cause of death was "craniocerebral trauma with submersion." Along with various minor scrapes on his body, abrasions showed on Ricky's forehead and left cheek, and his upper lip was cut and swollen. The doctor's internal examination of the body revealed contusions on the frontal lobes of the brain and bleeding. From the lack of any external pattern to the head injuries, the examiner concluded that a soft blunt instrument, such as a hand or fist, had inflicted the damage. He also stated that such injuries would have prevented purposeful movement. The doctor found extensive watery fluid in the lungs and surrounding cavities, as well as in the left side of the heart. Toxicology tests performed on the fluid indicated to Sturner that the victim had breathed water and that drowning was the final cause of Ricky Valente's death. Livor mortis, the postmortem pooling of blood in the parts of the body situated closest to the ground, indicated that Ricky had died face down in the water. The condition of the body suggested that he may have been in the water for anywhere from one to four days.

The police investigation following the homicide yielded insufficient evidence to charge Mastracchio. Ricky's parents related to the police that their son considered Mastracchio, a downstairs neighbor, his friend. Both parents separately told about a severe car accident in which Ricky had been involved when he was ten years old that had changed his personality. He had suffered a debilitating head injury that re-

---

1. The evidence does not clearly indicate when the body was identified. Mrs. Valente testified that the Rhode Island State Police informed her about her son on December 15, 1979. Mr. Va-

lente stated the date may have been December 16, 17 or 19. Doctor Sturner, however, said that he learned the boy's identity a day or two after the autopsy.

quired the insertion of a plate in his skull and approximately 436 stitches. The boy had become terrified of pain. The Valentes described their son as eager to please others, a follower rather than a leader, who preferred the company of older boys because he felt safe with them. At trial, Mrs. Valente said Ricky had been caught stealing a radio from a car parked at the next-door apartment building. According to Mrs. Valente's testimony, on Thanksgiving Day of 1979 she brought her son to the West Warwick police station and Ricky told the police that Gerry Mastracchio and Steven Dionne had participated in the theft attempt.

The State Police discovered a witness, Kenneth Chase, who substantiated that Valente, Mastracchio, and Dionne knew one another. Chase, who lived on a dead-end street containing only one other dwelling, identified photographs of the three youths from an array of eight or nine pictures. He remembered seeing them together at the other house on his street. Without any concrete evidence against Mastracchio, the police left the case unresolved.

Six years after the incident, on February 28, 1985, the Providence police apprehended Peter Gilbert. Gilbert implicated himself in several crimes and gave crucial information relating to the unsolved Valente case.[2] In return for this information, the Office of the Attorney General arrived at a plea arrangement with the witness.

Gilbert offered testimony that directly connected defendant to the crime. He testified that in 1983, after escaping from a Florida prison where he was serving a five-year sentence, he returned to Rhode Island. He immediately went to the home of his close friends, the Mastracchio family. At trial Gilbert stated he had known defendant since the latter was seven or eight years old and that he had helped to raise the boy. On his first or second night back

in town, he and Mastracchio drove around town "looking for beer." Gilbert, nervous about his escape status and attracting police attention, criticized defendant for disobeying traffic signals and driving erratically. At that point, Mastracchio bragged that the police would not bother him because they knew it would be futile. He admitted that the authorities had questioned him about a murder, and he told Gilbert that he and Dionne were concerned that Valente would speak up about crimes they had committed. According to Gilbert, Mastracchio confided that the two youths "gave him [Valente] a severe beating," "smacked his head in and threw him in the car," and drove toward Newport to dispose of the body. The defendant stated to Gilbert that he heard noises from the body. Approaching the crest of the Jamestown bridge, he and Dionne noticed no headlights behind them. Taking advantage of the fog and the concealment from oncoming traffic, they stopped the car and dumped the body over the rail, watching as Valente hit the water.

Despite Gilbert's extensive criminal record and favorable plea arrangement with the Attorney General, the jury believed his testimony and returned a verdict against defendant. The defendant presently contends, as he did below, that the Superior Court lacked jurisdiction to hear his case because at the time of the murder he was a seventeen-yearold youth subject only to Family Court jurisdiction. The fact that the state did not bring its case against him until he had attained the age of twenty-three should not subject the act of a minor to the adult criminal-justice system. The defendant further contends that the trial justice wrongly admitted Mrs. Valente's testimony regarding the stolen radio. He claims that the evidence constitutes hearsay that prejudiced defendant because it provided a motive for Mastracchio and substantiated Gilbert's testimony. The de-

---

**2.** Indictment Nos. Pl/85–1391–A and Pl/85–1392–C involved two murder charges and two conspiracies to commit murder. Pl/85–1393–A and Pl/85–1394–A included two additional conspiracies to commit murder, one conspiracy to commit robbery and one robbery charge. Gil-

bert also faced criminal charges in Maine and Florida. To undermine Gilbert's credibility, defense counsel thoroughly cross-examined Gilbert regarding his extensive criminal record and the overlapping of his several marriages and divorces.

fendant also appeals from the trial justice's having admitted Chase's identification testimony, his refusal to instruct the jury concerning that testimony, and his failure to give cautionary instructions or to pass the case in response to the prosecutor's allegedly prejudicial comment during closing argument.

I

JURISDICTION

■ General Laws 1956 (1985 Reenactment) § 8–10–3(a) establishes jurisdiction in the Family Court regarding "those matters relating to delinquent, wayward, dependent, neglected or mentally defective or mentally disordered children * * *." General Laws 1956 (1981 Reenactment) § 14–1–3(C) defines "child" as "a person under eighteen (18) years of age." Had the state initiated its case at the time of the crime, Mastracchio would have been subject to the parens-patrie treatment of the Family Court. Rather than fix criminal guilt and dispense punishment, the juvenile-justice system emphasizes rehabilitation as its purpose. *Kent v. United States,* 383 U.S. 541, 554, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84, 93–94 (1966); § 14–1–2.[3] The Family Court, however, is a statutory court that possesses limited jurisdiction, a court whose powers are restricted to those conferred by the Legislature. *State v. Kenney,* 523 A.2d 853, 854 (R.I.1987); *In re Craig F.,* 518 A.2d 629, 630 (R.I.1986); *Waldeck v. Piner,* 488 A.2d 1218, 1220 (R.I.1985); *Castellucci v. Castellucci,* 116 R.I. 101, 105, 352 A.2d 640, 645 (1976).

Although other courts have jurisdiction when a person over the age of eighteen commits a crime, once Family Court has attained jurisdiction over a child, it may continue to exercise power until that child turns twenty-one years old. *Knott v. Langlois,* 102 R.I. 517, 521, 231 A.2d 767, 768 (1967); § 14–1–6. Which court will exercise jurisdiction, however, is of crucial significance for the accused:

"Realistically, it can spell the difference between a proceeding civil in nature with the possibility of detention in a juvenile institution for rehabilitative rather than retributive purposes for a term which cannot extend beyond his 21st birthday and imprisonment as a criminal in an adult penal institution for a term which depending on the crime may be for as much as life." *Knott,* 102 R.I. at 521, 231 A.2d at 768–69.

In accordance with the rules of statutory construction, this court has firmly adhered to the age requirements circumscribing Family Court subject-matter jurisdiction. *See, e.g., In re Edward,* 441 A.2d 543 (R.I. 1982). In *In re Edward,* this court vacated an adjudication of delinquency of the Family Court because that court lacked subject-matter jurisdiction. *Id.* at 544. *Edward* concerned a youth who committed an offense on the day before his eighteenth birthday. Utilizing the common-law rule concerning birthdays, this court reaffirmed that jurisdiction is calculated according to age at the time of the alleged offense.[4] For jurisdictional purposes, Edward was an adult who should have been tried in Superior Court. Relying on the inverse of *In re Edward,* defendant in the instant case argues that Superior Court lacked the power to hear his case. We disagree.

3. General Laws 1956 (1981 Reenactment) § 14–1–2 states that the purpose of proceedings in Family Court is to "secure for each child under its jurisdiction such care, guidance and control * * * as will serve the child's welfare and the best interests of the state * * *."

4. Common law dictates that a person attains his or her next year on the first moment of the day prior to his or her birthday. *In re Edward,* 441 A.2d 543, 544 (R.I.1982).

Other states differ in regard to whether the youth's age at the time of the offense or indictment controls court jurisdiction. 47 Am. Jur.

2d *Juvenile Courts,* § 27 (1969). For states utilizing time of criminal activity, *see, e.g., In re P.H. v. State,* 504 P.2d 837 (Alaska 1972), *rev'd on other grounds, In re Matter of F.S.,* 586 P.2d 607 (Alaska 1978); *Turner v. State,* 508 N.E.2d 541 (Ind. 1987); *Stuart v. State ex rel. Jannings,* 253 N.W.2d 910 (Iowa 1977). *But see State v. Dehler,* 257 Minn. 549, 102 N.W.2d 696 (1960), and *State v. Darden,* 30 Wash.App. 460, 635 P.2d 760 (1981), holding that the defendant's age at the time of arraignment or trial determines jurisdiction.

Juveniles have no absolute constitutional right to avoid the adult penal system. *See State v. Berard,* 121 R.I. 551, 555, 401 A.2d 448, 450 (1979); *In re Correia,* 104 R.I. 251, 254, 243 A.2d 759, 761 (1968); *see also Wolf v. State,* 99 Idaho 476, 480–81, 583 P.2d 1011, 1015 (1978) (juveniles have no unqualified right to rehabilitative treatment as juveniles); *People v. Green,* 104 Ill.App.3d 278, 283, 60 Ill.Dec. 38, 41, 432 N.E.2d 937, 940 (right to be tried in Juvenile Court is a matter of procedure subject to waiver), *cert. denied,* 459 U.S. 872, 103 S.Ct. 159, 74 L.Ed.2d 133 (1982); *Trimble v. State,* 300 Md. 387, 424, 478 A.2d 1143, 1161–62 (1984) (certain juveniles are to be treated as adults), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985). The landmark case of *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), established certain due-process rights for juveniles facing the "critically important" issue of a Family Court waiver of jurisdiction. A court must conduct "meaningful review" based on a statement of specific reasons and facts motivating the waiver.[5] *Kent,* 383 U.S. at 561, 86 S.Ct. at 1057, 16 L.Ed.2d at 97. The Rhode Island Supreme Court specifically adopted this approach in *Knott,* 102 R.I. at 523, 231 A.2d at 770.

The Legislature has chosen to adopt special juvenile treatment for youths up to the ages of sixteen to twenty-one. *See* §§ 14–1–6 through 14–1–7.1. It could have chosen to treat all youths above fourteen years of age as adults. *State v. Berard,* 121 R.I. at 559, 401 A.2d at 453. Section 14–1–7, however, mitigates special treatment by permitting waiver. It provides in pertinent part:

"If a child sixteen (16) years of age or older is charged with an offense which would render said person subject to indictment if he were an adult, a justice of the family court after full investigation, may waive jurisdiction and order such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult * * *."

Section 14–1–7.1 mandates transfer of "[a] child sixteen (16) years of age or older who has been found delinquent for having committed two (2) offenses after the age of sixteen (16) which would render said child subject to an indictment if he were an adult * * * " out of Family Court for prosecution as an adult. Section 14–1–28 refers to the transfer from other courts to the Family Court of cases involving persons who were under eighteen at the time the offenses were committed and yet who still qualify as children within the meaning of the statute. No statute, however, addresses the jurisdiction problem of a child who commits an offense that would subject that child to transfer under § 14–1–7.1 but who escapes detection until he or she attains adulthood. Relying on the ability to waive jurisdiction over a seventeen-year-old, we address Mastracchio's claim in terms of the adequacy of the process by which he was tried rather than in terms of a complete lack of Superior Court jurisdiction to hear his case based on his minority status.

In *Kent,* which concerned appellate review of a defective waiver hearing, the United States Supreme Court remanded the case to the United States District Court for the District of Columbia for a de-novo-waiver hearing because "petitioner has now passed the age of 21 and the Juvenile

---

**5.** A juvenile-court judge should consider the defendant's prognosis for rehabilitation, probability of remaining dangerous beyond the age of twenty-one, or the defendant's failure to improve despite "exhaustive prior efforts by juvenile programs." *Wolf v. State,* 99 Idaho 476, 481, 583 P.2d 1011, 1016 (1978) (citing *State v. Gibbs,* 94 Idaho 908, 916, 500 P.2d 209, 217 (1972)). The purpose of a transfer proceeding is to balance the best interests of the offender, as those interests relate to the potential for rehabilitation, against society's interest in being protected from minors' criminal acts. *People v.*

*Clark,* 119 Ill.2d 1, 12–14, 115 Ill.Dec. 613, 618, 518 N.E.2d 138, 143 (1987); *State v. Ryan,* 226 Neb. 59, 80–81, 409 N.W.2d 579, 592 (1987). Alternatively, the court should consider "the best interests of the child and public," *White v. Sowders,* 644 F.2d 1177, 1178 (6th Cir.1980), *cert. denied,* 454 U.S. 853, 102 S.Ct. 299, 70 L.Ed.2d 146 (1981), or, more specifically, "[t]here must * * * be a thorough examination of the child, his background and alternative strategies of rehabilitation short of adult criminal treatment." *In re P.H. v. State,* 504 P.2d at 845–46.

Court can no longer exercise jurisdiction over him." *Kent v. United States*, 383 U.S. at 564, 86 S.Ct. at 1059, 16 L.Ed.2d at 99. The Court held that to vacate the conviction and to dismiss the indictment would be an inappropriate grant of "drastic relief." *Id.* This court subscribed to the same rationale in *Knott.* 102 R.I. at 529, 231 A.2d at 773 (order of Family Court vacated and case remanded to Superior Court for a de-novo-waiver hearing on a nunc-pro-tunc basis). The instant case differs from *Kent* and *Knott* in the absence of any initial waiver hearing conducted in the Juvenile Court.

Courts in other jurisdictions addressing the remand question have resolved the problem in various ways. The United States Court of Appeals of the Fourth Circuit, for example, having acknowledged that a petitioner being retried as an adult for a crime committed as a juvenile is entitled to "a judicial determination of some kind" that lack of an opportunity to oppose transfer caused no prejudice, proceeded to hold, "We have no difficulty in finding to a moral and legal certainty that no Juvenile Court, on the record in this case, would have denied transfer." *Brown v. Cox*, 481 F.2d 622, 627 (4th Cir.1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 761 (1974).

We refrain, however, from following *Brown* in severely intervening with the domain of the Rhode Island Family and Superior Courts. We find guidance, instead, from those courts that have remanded similar cases for a de-novo-waiver hearing.

We are firmly persuaded by the reasoning of the court in *White v. Sowders*, 644 F.2d 1177 (6th Cir.1980), a federal habeas corpus proceeding. Unlike the instant case, a waiver hearing was held. In a manner similar to *Knott* and *Kent*, a juvenile court waived jurisdiction over the defendant without making the required specific findings for a valid transfer. *Compare White v. Sowders*, 644 F.2d at 1178 *with Kent*, 383 U.S. at 546, 86 S.Ct. at 1049, 16 L.Ed.2d at 89 *and Knott*, 102 R.I. at 524, 231 A.2d at 770. Despite the de-

fendant's subsequent guilty plea, the Sixth Circuit found that the defendant could contest the legality of the transfer proceeding. *White v. Sowders*, 644 F.2d at 1180. Affirming the District Court finding of inadequacy in the transfer order, the Appellate Court attached significance to the fact that the minor had attained majority. Quoting from *Kent* concerning juvenile court's loss of jurisdiction, the Federal Court remanded the order to the District Court, rather than to Juvenile Court, for a hearing de novo on the waiver issue. *Id.* at 1185.

Given the constancy of Rhode Island precedent concerning the limitation of Family Court jurisdiction, the permissible waiver rule of § 14-1-7, and the unquestioned importance of a waiver hearing to protect defendant's due-process rights, we hold that defendant's appeal is valid, and we remand the case to Superior Court for a de-novo-waiver hearing to determine whether Family Court would have waived jurisdiction in the instant case.

## II

### THE TESTIMONY OF MRS. VALENTE

The following colloquy occurred between the prosecutor and Mrs. Valente at trial:

"Q. Okay. And what did he tell the West Warwick police?

\* \* \* \* \* \*

[Objection overruled.]

\* \* \* \* \* \*

"A. He told the police that he had taken a radio out of an automobile or attempted to take a radio out of an automobile and was caught doing so.

"Q. And did he implicate anybody else?

"A. Yes.

"Q. Who was that?

"A. Gerry Mastracchio, Steven Dionne."

The defendant argues that this testimony constitutes inadmissible hearsay that caused harmful error. He argues that the statements were offered to prove that the radio incident occurred and that defendant and Dionne perpetrated a crime with the deceased. Creating the image of a young-

ster led astray, the testimony generated sympathy for Valente, corroborated Gilbert's testimony regarding the motive for the murder, and impugned defendant's character by attributing to him the commission of a prior criminal act.

■ We think that defendant has intermingled two evidentiary rules. Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See State v. Brash*, 512 A.2d 1375, 1379 (R.I.1986); *State v. Coppola*, 502 A.2d 802, 804 (R.I.1985); *Gordon v. St. Joseph's Hospital*, 496 A.2d 132, 136 (R.I.1985); *McCormick on Evidence*, § 249 at 732 (3d ed. Cleary 1984). Unless the statement falls within an exception to the hearsay rule, it is barred from evidence. *State v. Brash*, 512 A.2d at 1379; *State v. Coppola*, 502 A.2d at 804; *State v. Santos*, 122 R.I. 799, 820, 413 A.2d 58, 70 (1980). Examining the instant testimony according to these definitions, we hold that it presents no hearsay problem. Importance lies in the fact that the conversation took place, not in believing that the three youths actually attempted to steal a radio. The story indicates that the victim told his mother about an alleged attempted theft and that she brought him to the police station. This account supported Gilbert's testimony that Mastracchio had a motive for the murder—fear that Valente would incriminate him.

■ The defendant objects that this testimony, which implicates him in a prior bad act, sullies his character. A general prohibition exists against admitting evidence of a defendant's previous crimes in order to avoid the conclusion that the defendant possesses a criminal nature and therefore committed the crime in question. *McCormick on Evidence*, § 190 at 557–58. Acts, however, which "may be probative of the identity of the criminal or of malice or specific intent," may be admitted into evidence to prove motive. *Id.* at 562. Rule 404(b) of the Rhode Island Rules of Evidence enunciates this principle. It reads in pertinent part, "Evidence of other crimes, wrongs, or acts * * * may, however, be admissible for other purposes, such as proof of motive, opportunity, intent * * *." *See State v. Lariviere*, 527 A.2d 648, 650 (R.I.1987); *see also State v. Wilshire*, 509 A.2d 444, 453 (R.I.1986) (evidence of defendant's forgery of life insurance policy admissible at trial as probative of motive for murder), *cert. denied*, 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 843 (1987); *State v. Gordon*, 508 A.2d 1339, 1347–48 (R.I. 1986) (note to girlfriend written shortly after crime probative of defendant's consciousness of guilt); *State v. Bernier*, 491 A.2d 1000, 1004 (R.I.1985) (introduction of similar nonremote sexual advances with persons other than the victim is admissible in order to establish the existence of one of the exceptions to the general rule of exclusion such as intent, motive, or design). Thus Rule 404(b) allows the introduction of Mrs. Valente's nonhearsay testimony, and defendant's arguments on this point are without merit.

## III

### ADMISSION OF IDENTIFICATION EVIDENCE

■ The defendant's next argument on appeal relates to the admissibility of testimony relating to Kenneth Chase's identification of defendant. At both the suppression hearing and the trial, the witness and Sergeant Edward P. Malley, Jr., of the Rhode Island State Police testified that on January 11, 1980, Sergeant Malley showed a photographic array to Chase. Chase identified photographs of the victim, Mastracchio, and Dionne and marked his initials on the reverse side of the pictures he selected. Relying on his initials, he later proceeded to reidentify the pictures he had selected in 1980. Although during the suppression hearing Chase could not positively recognize Mastracchio, at trial he pointed out defendant as the driver of one of the cars he had seen next door. The trial justice admitted the out-of-court identification evidence, over the objection of defense counsel, as past recollection recorded. The defendant contends that the trial justice erred in his decision because the past-recol-

lection-recorded exception to the hearsay doctrine requires that the witness lack present memory of the fact to be proved.

We disagree with defendant's argument. Rule 803(5) states:

"A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence and received as an exhibit."

For the statement to be admissible, the witness must have possessed firsthand knowledge of the event, must have composed the statement while he or she retained a clear memory of the event, must be unable independently to recall the incident, and must be able to vouch for the accuracy of the document. *State v. Vento,* 533 A.2d 1161, 1165 (R.I.1987); *State v. Coppola,* 502 A.2d at 807 (quoting *McCormick's Handbook of the Law of Evidence,* § 299 at 712 (2d ed. Cleary 1972)).[6] The defendant emphasizes that since Chase retained some memory of the identity, the trial justice should not have admitted the photographs as substantive evidence. The defendant bases his argument on *State v. Contreras,* 105 R.I. 523, 539, 253 A.2d 612, 621 (1969), which requires "a recollection which, although it once existed, has vanished completely and has been replaced by a written record * * *." In that case we distinguished past recollection recorded from present recollection refreshed. *Id.* at 539–41, 253 A.2d at 621–22. When the witness adopts the document as his testimony because he has no present memory from which to describe the event, the document is shown to the jury. *Id.* at 540, 253 A.2d at 621. If, however, the witness testi-

fies from his present memory, no reason exists to admit the document itself as substantive evidence.[7] *Id.* at 540, 253 A.2d at 622.

■ At the time this court decided *Contreras,* however, we relied on common-law precedent rather than statutory pronouncement. The Rhode Island Rules of Evidence, however, guide our instant decision. McCormick has enunciated a lenient interpretation of the words "memorandum or document" in Rule 803(5). "The Federal and Revised Uniform Rule (1974) use [*sic*] the somewhat broader terms 'memorandum or record,' which a tape recording, for example, should satisfy." *McCormick on Evidence,* § 301 at 866. The Rhode Island statute uses these terms. Indeed, defendant does not contend that a photograph cannot, by its nature, conform to the requirements for admissibility under the past-recollection-recorded exception. Chase initialed the pictures when he actually chose them, and he complied with the foundation requirements of personal knowledge and attestation of accuracy. The statute, furthermore, requires only an inability "to testify fully and accurately"; it does not demand a total lack of memory concerning the event. We therefore hold that the trial justice properly admitted the photographs as prior recollection recorded.

## IV

### JURY INSTRUCTION

■ The defendant next argues that the trial justice not only inadequately cautioned the jurors about the dangers of identification testimony but also failed to instruct the jurors that they must be satisfied that defendant committed the crime. The trial justice charged as follows:

"When passing upon or determining eyewitness identification there are several

---

**6.** *See also* Advisory Committee's Note, Rhode Island Rules of Evidence 803(5) at 878:

"To qualify under the exception, the witness must not be able to testify fully and accurately from memory alone, and the record must have been made or adopted when the matter was fresh in the declarant's memory."

**7.** *See* 3 Wigmore, *Evidence* § 754 at 122 (Chadborn rev. 1970): "[T]he modern—and desirable—trend is in the direction of the elimination of fiction and pretense and the straightforward admission of the record as substantive evidence."

elements or things which you should consider when determining whether or not that identification was accurate. You should take into consideration the amount of time of the alleged confrontation. You should take into consideration the condition—the lighting condition, the daylight, the lighting conditions surrounding that confrontation. You should take into consideration whether or not the witness who identified the defendant had ever seen that person before or since the confrontation. You should take into consideration the length of time that elapsed between the alleged confrontation and the actual identification. You should take into consideration whether or not there was any suggestiveness either by the person who presented the photographs to Mr. Chase or the photographs themselves. These factors you should consider when passing upon the issue of eyewitness identification."

The defendant's request to charge stated in part:

"You should view identification testimony with caution if the witness' opportunity for positive identification was not good, if his testimony was qualified, if his positive statements were weakened by cross examination or by his failure to identify defendant on one or more prior occasions, or if the accuracy of his testimony was doubtful. Caution is in order whenever you perceive weaknesses of any kind in the identification evidence."

The defendant based this request on the instructions utilized in *State v. Lewis*, 115 R.I. 217, 341 A.2d 744 (1975). In that case the trial justice essentially related the above instruction to the jury. Upon review, this court approved that charge, stating that it "adequately protected" against the dangers of identification testimony. *Id.* at 226, 341 A.2d at 749. We did not, however, establish this articulation as a mandatory charge.

The United States Supreme Court has held that the reliability of identification evidence primarily determines its admissibility. *Watkins v. Sowders*, 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549, 555 (1981). In *Manson v. Brathwaite*, 432 U.S.

98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977), the Court declared that opportunity to view the criminal during commission of the crime, the witness's degree of attention and accuracy of his prior descriptions, as well as his level of certainty and lapse of time, are the factors to be considered in determining the reliability of the identification. *See Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972).

General Laws 1956 (1985 Reenactment) § 8-2-38 reads:

"In every case, civil and criminal, tried in the superior court with a jury, the justice presiding shall instruct the jury in the law relating to the same, and may sum up the evidence therein to the jury whenever he may deem it advisable so to do; but any material misstatement of the testimony by him may be excepted to by the party aggrieved."

It requires instruction in the law to be applied to the issues. *State v. Hockenhull*, 525 A.2d 926, 930 (R.I.1987). Nowhere does it require the use of particular words in a charge. The trial justice may instruct the jury in his or her own words as long as the charge sufficiently addresses the requested instructions and correctly states the applicable law. *State v. Tooher*, 542 A.2d 1084, 1088, (R.I. 1988) (quoting *State v. Burke*, 522 A.2d 725, 736 (R.I.1987)); *State v. Caroulo*, 524 A.2d 575, 584 (R.I. 1987); *State v. Lambert*, 463 A.2d 1333, 1338 (R.I.1983).

In the instant case, defense counsel capably evoked impeaching testimony from the witness. At the suppression hearing Chase had selected a Providence College intern sitting in the courtroom, prior to choosing Mastracchio, as one of the people depicted in the photographs. During cross-examination defense counsel elicited this information as well as the witness's criminal record. Chase's ability to recognize the pictures in 1980 and to recall where and when he had seen the three individuals balanced those undermining factors. "[T]he proper evaluation of evidence under the instructions of the trial judge is the very task our system must assume juries

can perform." *Watkins v. Sowders,* 449 U.S. at 347, 101 S.Ct. at 658, 66 L.Ed.2d at 555. We hold that the trial justice's formulation of the instruction stressed those factors mandated by *Manson.* Furthermore it complied with § 8–2–38 and it related substantially the same elements as defendant's requested instruction. Rather than caution, as defendant specified, the trial justice emphasized consideration. The choice of words would not have significantly influenced the jury. Thus defendant's appeal on the identification instruction is of no merit.

## V

### PROSECUTOR'S CLOSING REMARKS

■ The defendant lastly argues that the trial justice should have taken curative measures in response to the prosecutor's allegedly prejudicial closing remarks. Shortly after commencing his summation, the prosecutor said:

"After I argue and you hear the law, you'll go up to deliberate. At that time all of you will represent the members of the State of Rhode Island. What you will do by your verdict, individually and collectively, you will tell the people in your community and the people of this State whether or not this type of conduct will be tolerated."

Although defense counsel promptly objected, the trial justice permitted the statement. Defense counsel failed to pursue the point by requesting a cautionary instruction or by moving for mistrial. Failure properly to preserve this issue for appeal prohibits defendant's argument.

The defendant correctly asserts that failure to ask for a cautionary instruction does not necessarily preclude appellate review. Generally, however, counsel must request such an instruction. *State v. Brennan,* 527 A.2d 654, 656 (R.I.1987); *State v. LaPointe,* 525 A.2d 913, 914–15 (R.I.1987). The trial justice will caution the jury or order a new trial sua sponte only in those cases wherein the prejudice cannot be erad-

icated from the jurors' minds and the improper material could have distracted the jurors' attention or affected their decision concerning the defendant's culpability. *State v. Brennan,* 527 A.2d at 656 (citing *State v. Anil,* 417 A.2d 1367, 1372 (R.I. 1980)); *State v. Pailin,* 114 R.I. 725, 730, 339 A.2d 253, 256 (1975).

According to the United States Supreme Court, the standard is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144, 157, *reh'g denied,* 478 U.S. 1036, 107 S.Ct. 24, 92 L.Ed. 2d 774 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). We have not absolutely demarcated the boundaries between those remarks causing indelible prejudice and those that an instruction will cure. *State v. Brown,* 522 A.2d 208, 210–11 (R.I. 1987). The trial justice must examine the probable effect of the remark according to its factual context. *Id.* at 211; *State v. Conway,* 463 A.2d 1319, 1324 (R.I.1983); *State v. Anil,* 417 A.2d at 1373. If the prosecutor's comment tends to inflame the jurors' passions so as to prevent their objective examination of the evidence, then prejudice exists. *State v. Brown,* 522 A.2d at 211, *State v. Conway,* 463 A.2d at 1324; *State v. Anil,* 417 A.2d at 1373.

In *State v. Greene,* 74 R.I. 437, 448, 60 A.2d 711, 717 (1948), this court held that "[t]he prosecutor may in effect tell the jury that the people look to them for protection against crime and may illustrate the effect of their verdict on the community or society generally with respect to obedience to, and enforcement of, the law." We thus have legitimated this type of "call to duty" comment in those cases in which the prosecutor refrains from emphasizing the remark to the point of distracting the jurors from consideration of the evidence.[8] The defendant urges the court to reconsider the *Greene* decision. Other jurisdictions, how-

---

**8.** This court recently held a prosecutor's emphasis of the personal loss of a victim's family improper for its potential to trigger an irration-
al response and to distract the jurors from the evidence. *State v. Mead,* 544 A.2d 1146 (R.I. 1988).

ever, set comparable limitations on permissible argument. *See, e.g., Whitlow v. State,* 509 So.2d 252 (Ala. Crim. App. 1987) (appeal to law enforcement permissible); *People v. Threadgill,* 166 Ill.App.3d 643, 117 Ill.Dec. 96, 520 N.E.2d 86 (1988) (attorneys may make comments upon the evil results of crime that do not inflame the jury); *State v. Walls,* 744 S.W.2d 791 (Mo. 1988) (prosecutor may argue the evil that can result to society if a defendant is found not guilty if the comment does not suggest personal fear); *People v. Sanchez,* 61 N.Y. 2d 1022, 463 N.E.2d 1228, 475 N.Y.S.2d 376 (1984) (prosecutor may not go so far as to threaten that community will censure jurors if they vote to acquit); *State v. Kaiser,* 417 N.W.2d 376 (N.D. 1987) (civic-duty obligation in closing argument cannot imply that jury should convict out of sympathy for the victim); *Commonwealth v. Gay,* 369 Pa. Super. 340, 535 A.2d 189 (1988) (argument suggesting jury should convict defendant in order to prevent senseless violence is impermissible because the statement was not based on the evidence).

In the instant case the prosecutor made no personal appeal or threat. The comment neither suggests improper sympathy for the victim nor inspires fear. Thus we find that the prosecutor's remark constituted acceptable argument.

For the foregoing reasons the appeal of the defendant is sustained in part. As previously stated, we remand the case to the Superior Court for a de-novo-waiver hearing to determine whether the Family Court would have waived jurisdiction. If the Superior Court determines that the Family Court would not have waived jurisdiction, then the defendant's conviction must be vacated. If, however, the Superior Court finds that waiver would have occurred, we affirm the decision of the trial justice, the judgment of conviction will stand, and the Superior Court shall proceed in accordance with this opinion.